# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,  )<br>               )<br>     Plaintiff,  )<br>               )<br>vs.            )<br>               )<br>HOMERO BARRERAS GASTELUM,  )<br>               )<br>     Defendant.  ) | 8:05CR170<br><br>REPORT AND<br>RECOMMENDATION |

This matter is before the court on the defendant's MOTION TO SUPPRESS (#20). The defendant moves for the suppression of all evidence and statements obtained following the stop of his vehicle on April 13, 2005. Specifically, the defendant alleges that his vehicle was stopped without probable cause or reasonable suspicion to believe that he was engaged in criminal activity, and that his detention and the subsequent search of his vehicle violated his rights under the Fourth Amendment to the United States Constitution. He further contends that any statements he made to law enforcement were made in violation of his rights under *Miranda v. Arizona,* 384 U.S. 436 (1966), and the Fifth Amendment to the United States Constitution.

For the reasons discussed herein, I recommend that the motion be denied.

## FACTUAL BACKGROUND

Dean Riedel testified that he is a seven-year employee with the Nebraska State Patrol currently serving as a trooper enforcing the traffic and criminal code of the State of Nebraska. On April 13, 2005 while westbound on Interstate 80, he observed a green SUV

at approximately mile marker 172, traveling eastbound and following a semi too closely (4:15-18). He performed a stopwatch clock of the vehicle as it passed his location and received a reading of .52 seconds. He obtained the reading by starting the stopwatch as the rear of the semi passed a crack in the road and stopping the stopwatch when the defendant's vehicle's front tires touched the same crack (5:1-10).

Trooper Riedel testified that based upon his reading of .52 seconds and using the two-second rule, he concluded that the defendant's vehicle was following too closely (5:13-21). He described the two-second rule as the guideline used by both the Nebraska State Patrol and the National Highway Safety Administration (6:12-23).

Riedel testified that after receiving the reading, he caught up to the green SUV and observed it had in-transit plates that were not readable (4:22-25).

Riedel testified that he stopped the vehicle and made contact with the driver. He requested a driver's license and registration, and asked the defendant if he spoke English, the defendant responded, "a little." The defendant produced an identification card which appeared to be from Mexico, and the registration for the vehicle (7:13-24). Riedel observed that as the defendant handed him the papers, the defendant's hands were shaking. He also noticed a new tube of glass sealant on the front seat, several screws missing from the molding, and an excessive amount of caulk around the vehicle's windows (8:1-11).

Riedel asked the defendant to exit the vehicle and have a seat in his patrol car. In the patrol car he engaged the defendant in casual conversation, during which he learned the

defendant was en route to Waterloo, Iowa for a job, that he was going to be working and staying in Waterloo for a while. However, the defendant then changed his mind and said he was en route for a job interview, that he was currently working in Denver, Colorado and was going to Waterloo, Iowa for an interview. However, the defendant did not know the location of where he would be staying in Waterloo, Iowa (8:16-25).

Riedel testified that he spoke to the defendant in English, that the papers the defendant gave him identified him as Miguel Soto Mendoza, and that when he asked the defendant his status as American citizen, the defendant responded he was illegal (9:21-24). Riedel noted that even though a Nebraska State Patrol trooper has the authority to detain an illegal for the proper agency, he did not detain the defendant but, rather, issued him a warning for following too close, returned his paperwork to him, and advised him he was free to go (10:5-13).

As the defendant started to exit the cruiser, Riedel asked him if he would have time to answer a few more questions, and the defendant agreed. Riedel asked the defendant if he had anything illegal in the vehicle and whether there was any money, weapons, or narcotics in the vehicle. Riedel noticed a distinct change in the defendant when methamphetamine was mentioned. While the defendant looked at Riedel when he was asking the other questions, when methamphetamine was mentioned, the defendant turned his head away, looked at his lap, and then turned to Riedel and said, "no." (11:4-18).

Riedel testified he then asked the defendant for his consent to search the vehicle and the defendant gave his verbal consent. Riedel then filled out a permission to search form

printed in Spanish (Ex. 2), gave it to the defendant, and asked him to read it. The defendant appeared to read it, related that he understood the form, and signed the form at 3:44 p.m. (12:4-10). Riedel noted the defendant asked no questions about the form and during the search did not request that the search be stopped (13:7-12).

Riedel testified that he searched the vehicle, located a duct-taped package in the air filter cannister in the engine compartment, returned to his cruiser, and placed the defendant under arrest (13:17-22). He read the defendant his *Miranda* rights in Spanish. The defendant responded that he understood each of the rights (14:3-6) and signed the form (Ex. 3). Riedel noted he made no promises or threats, that the defendant did not request the services of an attorney, and did not ask any questions about the form (15:17-25).

After the form was signed, the defendant was transported to the North Platte patrol office where Riedel turned him over to other investigators (16:1-9). Riedel noted that his contact with the defendant, from the time he turned on his emergency lights until they arrived at the Nebraska State Patrol headquarters, was recorded on his in-car video (Ex. 1; 17:3-15).

On cross-examination Riedel noted that when he first contacted the defendant, he did not mention the violation for following too close but, rather, mentioned that he could not see the in-transits (18:11-24). Riedel admitted that he could see the in-transits after he exited his patrol vehicle and got to the rear of the defendant's vehicle (18:25-19:5), and that he never ran the in-transits to verify whether they were actually registered to the defendant's vehicle

but, rather, determined that they were valid based upon a comparison with the actual registration he received from the defendant (20:20-21:1).

On cross-examination Riedel admitted that there were some issues with the conversation he had with the defendant and at times he reissued the question in a way in which the defendant could give an affirmative answer that he understood. Riedel admitted to some confusion during the conversation, stating that it would have been a much better conversation if he was fluent in Spanish (23:14-24).

On cross-examination Riedel stated that the two-second rule is not in the Nebraska state statutes, but that the statute refers to following closer than is "reasonable and prudent" (27:8-14), and that at 60 mph, .52 seconds would not be reasonable and prudent (27:18-25). Riedel testified that when he observed the defendant's vehicle it was traveling at approximately 70 mph (28:11-13).

Carlos Trevino testified that he is a four-employee of the Nebraska State Patrol currently assigned as an investigator with the drug division. On August 13, 2005 he contacted the defendant at the North Platte office of the Nebraska State Patrol at approximately 5:15 p.m. (33:1-22). He noted that when he first made contact the defendant, he was sitting in the sergeant's office with Special Agent Gil Johnson of Immigration and Customs Enforcement (33:24-34:4).

Trevino testified that he showed the defendant the advice form that had been given him by Riedel and signed by the defendant (Ex. 3), and asked the defendant if he was aware

of his rights and understood the rights (34:5-10). Trevino does not speak Spanish, so he spoke to the defendant in English and the defendant responded to part of the interview in English. If the defendant did not understand the question in English, Special Agent Johnson translated the question to Spanish and the defendant responded in Spanish and/or English (35:4-23).

Trevino testified that during the interview the defendant responded appropriately to the questions asked and that if the defendant needed a follow-up or appeared not to understand, the defendant would state that he did not understand or make a non-verbal gesture, like shrugging his shoulders, and Trevino would rephrase the question and Special Agent Johnson would then ask the question in Spanish (36:11-24). Trevino described the defendant as cooperative and noted that the defendant never requested the interview be stopped, nor did he request to talk to an attorney (36:25-37:7).

Trevino testified that he also took part in a second interview with the defendant because the defendant indicated a willingness to participate in a controlled delivery with law enforcement (37:11-16). However, a controlled buy never occurred as the defendant asked for an attorney (39:2-17). Trevino noted that his contact with the defendant was recorded on an audiotape (Ex. 5) and that the tape fairly and accurately depicts his interview (38:4-11).

On cross-examination Trevino admitted that at some time during his conversation with the defendant in the presence of Special Agent Johnson, it was determined it would be a good

idea to call a Spanish translator, as Johnson had advised Trevino that their office had interpreters available (40:22-41:3).

Trevino testified on cross-examination that even though he does not speak Spanish, he would understand when the defendant wanted to stop the questioning due to non-verbals that the defendant could provide, and that during the interview the defendant was open and cooperative (42:3-9).

On direct examination Gilbert Johnson testified he is a Special Agent with the Department of Homeland Security, Immigration and Customs Enforcement, and that prior to his current assignment he was a United States Border Patrol Agent stationed on the southern border in California (44:18-25). Johnson testified that while his primarily language was English, he does speak Spanish because it is taught at the border patrol academy and a majority of the people that he deals with speak Spanish (45:15-25).

On April 13, 2005 Johnson was called to the Nebraska State Patrol headquarters to help with an investigation. When he arrived he introduced himself to the defendant and spoke with defendant in English and Spanish, but the majority of the conversation was in Spanish (46:19-22). He read the defendant his *Miranda* rights in Spanish from his service-issued I-214 rights card (Ex. 4), and asked the defendant if he understood his rights as they were read to him. The defendant responded that he did. He asked the defendant if he wanted a lawyer and the defendant told him no. He asked the defendant if he was going to answer

questions without the presence of an attorney, and the defendant stated that he would (47:3-10; 48:1-2).

Johnson noted that during his interview with the defendant, the defendant identified himself as Miguel Soto and that he had a driver's license from Mexico with that name. However, during the interview the defendant mentioned that his name was Manuel and that when Johnson asked him his real name, he told him Homero Barreras Gastelum. It was at that time that Johnson was able determine the defendant's criminal history, which revealed he had been deported (48:13-25).

Johnson noted that during this interview the defendant did not indicate that he had any problem understanding the Spanish language and he responded appropriately to all questions asked. Johnson described the defendant as cooperative during the interview (50:8-15), noting that during the interview the defendant did not request the services of an attorney, and did not ask to stop the interview. Johnson stated that he made no promises or threats to the defendant during the interview (51:10-22).

Johnson testified that six days later, on April 19, 2005, he again had contact with the defendant after the defendant was taken to his office to fill out immigration paperwork (51:23-52:3). Again, Johnson introduced himself and read the defendant his rights in Spanish using the same card (Ex. 4), asked the defendant if he wanted an attorney, asked the defendant if he understood his rights, and if he was willing to answer questions. The defendant responded that he would answer Johnson's questions (52:4-12). The contents of

the interview, including defendant's signed statement that he did not wish to have a lawyer present to advise him and was willing to answer Johnson's questions, are recorded in Exhibit 6. Johnson testified he spoke with the defendant in Spanish, noting that he did not promise anything or threaten the defendant, and that the defendant appeared to be cooperative (53:14-54:5).

On cross-examination Johnson testified he observed the defendant sign the rights waiver (Ex. 3) at the police station, and he noted that he would be surprised if Riedel had testified earlier that Exhibit 3 was signed in Riedel's patrol car (55:19-23).

On redirect examination Johnson testified that throughout his conversations with the defendant, he had no difficulty speaking with the defendant in Spanish (59:17-20).

Homero Barreras Gastelum testified that he remembered his conversations with Special Agent Johnson and Trooper Trevino (61:11-18). He noted that before his first interview with Trevino and Johnson, he had an opportunity to speak with Johnson alone (61:19-62:1) and Johnson asked him who his mother and father were and told him that if he cooperated, his time would be reduced (62:4-7). Gastelum testified that he spoke with Johnson in Spanish and that he was told that if he cooperated he would get very little time or just be sent to Mexico (62:23-63:7). Gastelum admitted that he had no difficulty understanding Special Agent Johnson when Johnson spoke to him in Spanish (64:18-23).

On cross-examination Gastelum testified that Johnson told him, "if I didn't cooperate I'd get a lot of time, that if I participate and put in a little on my part, then I'd do less time – I'd do very little time in jail" (64:7-13).

## LEGAL ANALYSIS

### A.     Probable Cause To Stop

The evidence in this case establishes that on April 13, 2005, Nebraska State Patrol Trooper Dean Riedel was westbound on Interstate 80 at mile marker 172 when he observed Gastelum's SUV following a semi. Riedel testified that using the two-second rule, he determined with a stopwatch that Gastelum's SUV was within .52 seconds of the rear of the semi.

The Eighth Circuit in *United States v. Mallari*, 334 F.3d 765, 766-67 (8th Cir. 2003) has stated:

> We have repeatedly held that "*any* traffic violation, regardless of its perceived severity, provides an officer with probable cause to stop the driver." *United States v. Jones*, 275 F.3d 673, 680 (8th Cir. 2001).  "To determine whether a traffic stop was based on probable cause or was merely pretextual, an 'objective reasonableness' standard is applied." *Id.*  An officer is justified in stopping a motorist when the officer "objectively has a reasonable basis for believing that the driver has breached a traffic law." *United States v. Thomas*, 93 F.3d 479, 485 (8th Cir.1996); *see* [*United States v. Sanders*, 196 F.3d 910, 913 (8th Cir. 1999)] (officer's mistaken belief, but objectively reasonable basis for believing, that a traffic violation occurred supported traffic stop). Moreover, subjective intent is not determinative in deciding whether the stop was reasonable. *See Whren v. United States*, 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996).

Neb. Rev. Stat. § 60-6,140[1] provides that the driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the roadway. Riedel concluded that Gastelum's SUV was traveling closer to the semi than was reasonable and prudent based on the conditions, first by observation and then by applying the two-second rule. The two-second rule has been approved as a basis for determining whether a vehicle is following another too closely, and the circumstances that would justify law enforcement's execution of a stop. *See United States v. Perez*, 200 F.3d 576 (8th Cir. 2000), and *United States v. Gregory*, 302 F.3d 805 (8th Cir. 2002), *cert. denied*, 538 U.S. 992 (2003).

I have reviewed the video and while the violation does not appear on the videotape, I find Riedel's testimony to be credible. I also note the video reflects that he issued Gastelum a warning ticket for following too close. The traffic violation provided probable cause for stopping the vehicle. For these reasons, Gastelum's first claim must be denied.

**B. Scope and Duration of the Traffic Stop; Noncustodial Statements**

Having made a valid traffic stop, an officer is allowed to detain the occupants of the vehicle while completing "a number of routine but somewhat time-consuming tasks related to the traffic violation, such as computerized checks of the vehicle's registration and the driver's license and criminal history, and the writing up of a citation or warning." *United States v. $404,905.00 in United States Currency*, 182 F.3d 643, 647 (8th Cir. 1999),

---

[1] During the hearing on the motion, the court took judicial notice of Neb. Rev. Stat. § 60-6,140.

*cert. denied*, 528 U.S. 1161 (2000). "During this process, the officer may ask the motorist routine questions such as his destination, the purpose of the trip, or whether the officer may search the vehicle, and he may act on whatever information is volunteered." *Id. See also United States v. White*, 81 F.3d 775, 778 (8th Cir.), *cert. denied*, 519 U.S. 1011 (1996); *United States v. Ramos*, 42 F.3d 1160, 1163 (8th Cir. 1994), *cert. denied*, 514 U.S. 1134 (1995).

In this case, a review of the videotape shows that most of these tasks were accomplished in less than nine minutes, at which time Trooper Riedel returned all of defendant's documents and indicated they were finished with the stop, and defendant began to exit the patrol car. Not until then did Riedel ask the defendant if he would have time to answer a few more questions. The defendant agreed, at which time Riedel asked him several questions about whether or not he had contraband in the vehicle and asked for permission to search the vehicle.

I find that the defendant was no longer "seized" within the meaning of the Fourth Amendment after Riedel returned his documents, and a reasonable person in defendant's position at the time Riedel asked for further conversation and permission to search would "feel free to terminate the encounter and be on his way." Riedel did not somehow re-seize the defendant by asking if he could talk to him and obtaining permission to do so. *See United States v. Morgan*, 270 F.3d 625, 630 (8th Cir. 2001), *cert. denied*, 537 U.S. 849 (2002). Nothing in the record suggests that Riedel acted in such a way that a reasonable person

would believe that he was not free to decline the request for further conversation or terminate the encounter altogether. *See id.* Thus, I find that the nine-minute traffic stop was not unlawfully expanded, and that the subsequent contact between defendant and Riedel was consensual. *See, e.g., United States v. White*, 81 F.3d at 779 (after defendant's license and registration were returned and the warning was issued, the encounter "became nothing more than a consensual encounter between a private citizen and a law enforcement officer"); *United States v. Sanchez-Garcia*, 313 F.3d 1073, 1078 (8th Cir. 2002) (defendant was no longer seized within the meaning of the Fourth Amendment after officer returned his identification and issued a warning ticket).

In the alternative, should the district court find that the continued contact was not consensual, I find that grounds for reasonable suspicion were generated in the course of the initial contact which were sufficient to justify engaging the defendant in conversation after the traffic stop concluded. An officer who develops a reasonable, articulable suspicion of criminal activity may expand the scope of an inquiry beyond the original reason for the stop and detain a vehicle and its occupants for further investigation. *See United States v. Poulack*, 236 F.3d 932, 935-36 (8th Cir.), *cert. denied*, 534 U.S. 864 (2001)). Whether an officer had reasonable suspicion to expand the scope of a stop is determined by examining the totality of the circumstances, in light of the officer's experience. *Id.* In this instance, the defendant changed his story as to his reason for travel, his demeanor changed when asked about methamphetamine, his hands were shaking, the vehicle was missing molding and there was

-13-

excessive window caulking. These factors all provided a basis for further inquiry beyond the original reason for the stop.

### C.      Search of the Vehicle

Police may conduct a search of someone's vehicle, home or person even without a warrant or probable cause if that person voluntarily consents to the search. *See, e.g., United States v. Bradley*, 234 F.3d 363, 366 (8th Cir. 2000); *United States v. Deanda*, 73 F.3d 825 (8th Cir. 1996). To determine whether such a consent was voluntary, the court must examine the totality of the circumstances, including the characteristics of the accused and the nature of the encounter. *See Bradley*, 234 F.3d at 366. The government has the burden of proving consent was voluntary. *United States v. Parris*, 17 F.3d 227, 229 (8th Cir.), *cert. denied*, 511 U.S. 1077 (1994); *United States v. Heath*, 58 F.3d 1271, 1275 (8th Cir.), *cert. denied*, 516 U.S. 892 (1995). "The prosecution need not prove that the individual was fully aware of his or her rights under the Fourth Amendment in order to establish a voluntary consent." *Heath*, 58 F.3d at 1275 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 235 (1973)). "Consent is voluntary 'if it was the product of an essentially free and unconstrained choice by its maker, rather than the product of duress or coercion, express or implied.'" *United States v. Fleck*, 413 F.3d 883, 891 (8th Cir.2005) (quoting *United States v. Chaidez*, 906 F.2d 377, 380 (8th Cir. 1990)).

The recorded conversation between Trooper Riedel and the defendant generally corroborates the officer's testimony, as do the verbal and written consents to search executed

-14-

by the defendant. The consents were not limited in any fashion, not retracted, and not the result of any threat, promise, or inducement by Riedel. Considering the *Chaidez* factors[2] in conjunction with the videotape and the hearing testimony, I find that the defendant voluntarily consented to the search of his vehicle.

### D.     Defendant's Custodial Statements

"*Miranda* protections are triggered only when a defendant is both in custody and being interrogated. *United States v. Lawrence*, 952 F.2d 1034, 1036 (8th Cir.), *cert. denied*, 503 U.S. 1011 (1992). 'Interrogation' is 'express questioning,' or words or actions 'that the police should know are reasonably likely to elicit an incriminating response....' *Rhode Island v.*

---

[2]Courts in the Eighth Circuit generally consider the "*Chaidez* factors" to determine if consent was voluntary:

> "Characteristics of persons giving consent" which may be relevant to the question include: (1) their age; (2) their general intelligence and education; (3) whether they were intoxicated or under the influence of drugs when consenting; (4) whether they consented after being informed of their right to withhold consent or of their *Miranda* rights; and (5) whether, because they had been previously arrested, they were aware of the protections afforded to suspected criminals by the legal system.
>
> *Id*. at 381 (internal citations omitted). Characteristics of "the environment in which consent was given" include:
>
> whether the person who consented (1) was detained and questioned for a long or short time; (2) was threatened, physically intimidated, or punished by the police; (3) relied upon promises or misrepresentations made by the police; (4) was in custody or under arrest when the consent was given; (5) was in a public or a secluded place; or (6) either objected to the search or stood by silently while the search occurred.
>
> *Id*. (internal citations omitted). The factors should not be applied mechanically, *id*., and no single factor is dispositive or controlling. *United States v. Ponce*, 8 F.3d 989, 997 (5th Cir.1993).

*United States v. Bradley*, 234 F.3d at 366.

*Innis*, 446 U.S. 291, 301 (1980); *Lawrence*, 952 F.2d at 1036...." *United States v. Hatten*, 68 F.3d 257, 261-62 (8th Cir. 1995), *cert. denied*, 516 U.S. 1150 (1996) (parallel citations omitted).

"Routine biographical information" is exempt from *Miranda*'s coverage. *See Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990). Accordingly, Riedel was permitted to ask the defendant his name. Defendant's response, giving a false name, is admissible. *United States v. Brown*, 101 F.3d 1272, 1274 (8th Cir. 1996).

During the traffic stop, the defendant produced the vehicle registration and an identification card which appeared to be from Mexico, prompting Trooper Riedel to inquire about defendant's status as American citizen. The defendant responded that he was illegal. This question did not involve "routine biographical information" or any task related to the traffic violation. Under the circumstances, I believe the officer should have known the question was reasonably likely to elicit an incriminating response. Since the defendant had not yet been given his *Miranda* warnings, I will recommend that this statement be suppressed.

As discussed above, defendant was not "in custody" when he made subsequent statements to Trooper Riedel. In any event, a consent to search is not an "incriminating statement" for purposes of *Miranda*. *See Cody v. Solem*, 755 F.2d 1323, 1330 (8th Cir.), *cert. denied*, 474 U.S. 833 (1985); *United States v. McClellan*, 165 F.3d 535, 544 (7th Cir.), *cert. denied*, 526 U.S. 1125 (1999); *United States v. Shlater*, 85 F.3d 1251 (7th Cir. 1996);

*United States v. Henley*, 984 F.2d 1040, 1042 (9th Cir. 1993) (the mere act of consenting to a search does not incriminate a defendant, although the derivative evidence uncovered may be highly incriminating). Thus, *Miranda* warnings need not be given prior to requesting consent to search. *United States v. Newton*, 259 F.3d 964, 966-67 (8th Cir. 2001) (citing *United States v. Payne*, 119 F.3d 637, 643 (8th Cir.), *cert. denied*, 522 U.S. 987 (1997)).

After Trooper Riedel found contraband in the engine compartment of the vehicle, he arrested the defendant and read the defendant his *Miranda* rights in Spanish. The defendant responded that he understood each of the rights and, at some point, signed Exhibit 3.[3] I credit Riedel's testimony that he made no promises or threats, that the defendant did not request the services of an attorney, and did not ask any questions about the rights advisory form.

It does not appear that the defendant made any further statements until he was interviewed at the State Patrol office in North Platte. At that time, he was once again given his *Miranda* rights by Agent Johnson and a preliminary interview was conducted. I find that the defendant voluntarily waived his *Miranda* rights on this occasion.

Another interview was conducted on April 19, 2005, at which time Agent Johnson re-Mirandized the defendant. Defendant's waiver of his *Miranda* rights on April 19, 2005 is memorialized in Exhibit 6. I credit Agent Johnson's testimony that he did not promise

---

[3]Trooper Riedel and Agent Johnson both testified that they had completed the rights advisory form (Ex. 3). The form was signed by the defendant as "Miguel Mendoza." Investigator Trevino testified that he later reviewed and initialed the form at State Patrol headquarters in North Platte at the time of the defendant's interview. He specifically noted that the form had previously been given to the defendant by Riedel and that Agent Johnson was present during the interview. (33:16-21). Apparently, all three officers participated in the completion or reading of Exhibit 3.

anything or threaten the defendant and find that the defendant voluntarily waived his *Miranda* rights as to the April 19 interview.

## RECOMMENDATION

In summary, I find that Trooper Riedel had probable cause to stop defendant's vehicle for traffic offenses. The defendant was detained for about nine minutes, at which time the officer issued a warning, returned defendant's documents, and advised the defendant he was free to leave. The defendant voluntarily agreed to continue talking to Riedel, and voluntarily consented to the search of his vehicle. After contraband was found in the vehicle, defendant was placed under arrest and Mirandized. The defendant voluntarily waived his *Miranda* rights. Aside from the defendant's uncounseled admission during the traffic stop that he was "illegal," his statements were voluntarily made.

For these reasons,

**IT IS RECOMMENDED** that defendant's MOTION TO SUPPRESS (#20) be granted in part, and denied in part, as follows:

1. The motion should be granted with respect to defendant's admission that he was "illegal."

2. The motion should be denied in all other respects.

**DATED September 20, 2005.**

                                       **BY THE COURT:**

                                       **s/ F.A. Gossett**
                                       **United States Magistrate Judge**