IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | 8:05CR170 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MEMORANDUM AND ORDER |
| | ) | |
| HOMERO BARRERAS GASTELUM, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter is before the court on defendant's objection, Filing No. 32, to the report and recommendation of the United States Magistrate Judge ("magistrate"), Filing No. 28, recommending denial, in part, of defendant's motion to suppress, Filing No. 20. Defendant is charged with drug distribution in violation of 21 U.S.C. §§ 846 and 841(a)(1) and (b)(1). In his motion to suppress, defendant challenges the constitutionality of the traffic stop and the ensuing search and also argues that law enforcement officers violated *Miranda v. Arizona*, 384 U.S. 436 (1966), in eliciting statements from him while he was in custody.

**I. BACKGROUND**

An evidentiary hearing before the magistrate was held on August 10, 2005. Filing No. 24, Minutes of Hearing; Filing No. 27, Transcript of Hearing ("Hr'g Tr."). Under 28 U.S.C. § 636(b)(1)(C), the court has conducted a de novo review of those portions of the report or recommendations to which defendant objects. *United States v. Lothridge*, 324 F.3d 599, 601 (8th Cir. 2003). The court has reviewed the record, including the transcript of the hearing and a videotape of the traffic stop at issue. *See* Filing No. 26, Hr'g Tr.; Hearing Exhibit ("Hr'g Ex.") 1. For the reasons set forth below, the court finds defendant's objection to the magistrate's recommendation should be sustained, the recommendation

of the magistrate should be adopted only in part and the defendant's motion to suppress should be granted.

The court generally accepts the magistrate's factual findings with certain modifications as outlined below. Specifically, the court does not agree with the magistrate's findings on the issue of custody. The videotape of the incident shows that Nebraska State Patrol Trooper Dean Riedel pulled the defendant's vehicle over on Interstate 80 in Nebraska, approached the vehicle, accompanied by a dog, and asked for the driver's license in English. Hr'g Ex. 1 at 15:34-35. The defendant did not appear to understand much English. *Id.* Trooper Riedel asked, "Any English? Uno pequito?" *Id.* at 15:35. The trooper stated in English, "The reason I stopped you is I couldn't read your 'in transits' on the vehicle and I wanted to make sure everything was alright." *Id.* He also asked, "Is this your vehicle? Is this your el caro?" *Id.* The defendant responded in broken English that he was going to Waterloo, Iowa, for a job. *Id.* at 15:37. Trooper Riedel then asked the defendant to accompany him to the patrol car and repeated the request twice. *Id.* at 15:36. Trooper Riedel proceeded to ask defendant about his destination and defendant responded that he was going to Waterloo, Iowa, for a job. *Id.* at 15:37. Trooper Riedel continued to ask the defendant about his destination and the purpose of his trip and the defendant responded in halting English to the questions. *Id.* at 15:38-40. Several exchanges between Trooper Riedel and the defendant show that Gastelum did not fully understand Trooper Riedel's questions. For example, the defendant was asked whether he "had a job now" or was "going for an interview now" and the defendant answered "Now." *Id.* at 15:38-39. He was asked whether everything he owned was in the vehicle and he answered, "It's a '96." *Id.*

After a short period of silence, Trooper Riedel also asked the defendant, "Are you legally in the United States?" and the defendant answered "Illegal." *Id.* at 15:39. More silence followed and then Trooper Riedel apparently handed Gastelum's license and registration back to him, stating, "Here is your information back, okay?" *Id.* at 15:40. Trooper Riedel explained, in English, "I also stopped you for following too closely, did you realize that?" *Id.* at 15:41. Trooper Riedel then rephrased that question three times in English. *Id.* He stated that Gastelum would be given a warning, not a ticket, for the offense, after which Gastelum made some inquiry in Spanish and Trooper Riedel stated, "No, no dinero." *Id.* Trooper Riedel then asked, in English, "Do you have any questions for me?" and then stated, "Take care." *Id.* at 15:43:08-14. Immediately thereafter, Trooper Riedel asked (in an elevated voice), "Hey sir, can I ask you just a couple more quick questions?" *Id.* at 15:43:17. Then, "Can I talk to you some more?" *Id.* at 15:43:21. The defendant answered "no." *Id.* at 15:43:22. Trooper Riedel next stated, "It's okay?" and the defendant responded, "okay," but then apparently attempted to exit the vehicle. *Id.* at 15:43:23. Trooper Riedel then stated in an urgent or insistent tone, "Can you come here and shut the door, I need to keep him cool" followed by "Can you shut that for me?" and "no . . . no . . . no, sir." *Id.* at 15:43:24-38. That exchange was followed by the sound of a car door slamming, and Trooper Riedel stated "There you go." *Id.* at 15:43:38.

Trooper Riedel proceeded to ask the defendant whether he happened to "have any contraband in el caro" and then whether the defendant had any of a litany of other prohibited substances. *Id.* at 15:43-44. The questions were generally asked in English interspersed with a few Spanish words such as "large amounts of dinero," "narajas" or "pistolos." *Id.* at 15:43-44. While asking the questions, Trooper Riedel repeated "look at

3

me" or "keep looking at me," several times using a commanding tone. *Id.* These questions were asked in rapid succession and in an increasingly loud voice, bordering on a shout. *Id.* Defendant generally answered "no," to the trooper's questions but gave some seemingly incongruous answers. *Id.*

Trooper Riedel then asked the defendant "Can I search your vehicle?" *Id.* at 15:44:21. That question was followed immediately by "Can I search el caro?" *Id.* at 15:44:23. The defendant clearly answered "No. Nothing." *Id.* at 15:44:25. Trooper Riedel immediately asked again, twice, in a louder, more insistent tone. *Id.* at 15:44:29. Defendant then said, "Yeah, it's okay." *Id.* at 15:44:32. Trooper Riedel stated, "It's okay?" and the defendant answered "Yeah." *Id.* at 15:44:34. There followed approximately one minute of silence, after which Trooper Riedel apparently handed the defendant something and stated in a loud, authoritative voice, "Can you read this out loud? Read it out loud to me." *Id.* at 15:45. The defendant did not read or say anything out loud, but after seven or eight seconds, Trooper Riedel said, "Comprende?," followed immediately by "Firme." *Id.* at 15:45.

The state trooper and a dog can be seen and heard exiting the police cruiser shortly thereafter. *Id.* at 15:46. Trooper Riedel proceeded to search the interior of the vehicle, the trunk, including defendant's luggage, and finally beneath the hood of the car. *Id.* at 15:45-16:15. During the search, Trooper Riedel was joined by another officer. *Id.* The trooper apparently found contraband under the hood of the car. *Id.* at 16:04. One of the troopers then told the defendant several times, "Get out, get on the ground." *Id.* at 16:04. Several minutes later, the defendant was asked to read another document, apparently a waiver of

*Miranda* rights, out loud. *Id.* at 16:09. The defendant read each statement outlining his rights in Spanish, after each of which a trooper asked "Comprende?" and defendant answered "Si." *Id.* at 16:09-10; Hr'g Ex. 3. The defendant was not asked to read the paragraph stating that he waived his rights, nor was he asked whether he waived them. *Id.* at 16:10; see Hr'g Ex. 3. Trooper Riedel then asked the defendant, "Want to talk to me now?" and defendant answered with a long statement in Spanish. *Id.* at 16:10.

At the suppression hearing Trooper Riedel testified that the defendant appeared nervous from the outset. Hr'g Tr. at 26. He stated that he had participated in a three-day "survival Spanish" course, but conceded that he was not proficient in Spanish. *Id.* at 9. He testified that when the defendant seemed not to understand him, he cleared up the confusion by rephrasing the question in English until the defendant appeared to understand. *Id.* at 23. He acknowledged that he did not know how to say either "Do you have any questions?" or "You have the right to refuse to consent" in Spanish. *Id.* at 23. Trooper Riedel also testified that he relied only on the defendant's consent to justify the search. *Id.* at 17-18.

Special Agent Gilbert Johnson of the United States Department of Homeland Security, Immigration & Customs Enforcement also testified at the hearing. *Id.* at 44-60. He testified that he speaks Spanish and was asked to assist in an interview at the State Patrol headquarters and to help translate when Nebraska State Patrol officers interviewed the defendant. *Id.* at 46. He was asked to read a rights advisory to defendant after he had been taken to the State Patrol Office. *Id.* at 47. A certified interpreter, proficient in Spanish, was later called into the State Patrol Office to help interview defendant. *Id.* at 58.

5

An interpreter was provided for all other proceedings involving defendant, including the evidentiary hearing on this motion.

The magistrate found that the traffic stop at issue was supported by probable cause in that the defendant was following too closely and any traffic violation, however minor, creates probable cause. R&R at 11. The magistrate further found that defendant was no longer "seized" or in custody once the trooper had "returned his documents, and a reasonable person in defendant's position at the time [Trooper] Riedel asked for further conversation and permission to search would 'feel free to terminate the encounter and be on his way.'" R&R at 12. The magistrate alternatively found that the trooper had reasonable articulable suspicion to expand the scope of the stop under the totality of the circumstances. *Id.* at 13-14. He further found that the defendant had, in any event, voluntarily consented to the search of his vehicle. The magistrate, however, found a *Miranda* violation in connection with defendant's statement that he was an illegal alien and recommended that statement be suppressed. *Id.* at 16. He found that defendant was not "in custody" with respect to any other statements that the defendant made. *Id.* at 16-17.

**II. DISCUSSION**

Because Trooper Riedel had returned defendant's papers to him, the magistrate found defendant was not in custody when he consented to the search of his vehicle. Gastelum's objection to the magistrate's recommendation essentially involves two separate but intertwined issues: (1) whether he was in custody and (2) whether that fact, along with the *Miranda* violation, affects the voluntariness of his consent to search. Once a custodial relationship is established, questioning assumes a presumptively coercive character. *See Miranda*, 384 U.S. at 467. The appropriate inquiry, assuming a finding of custody and a

*Miranda* violation, is whether these factors affect the voluntariness of Gastelum's consent.[1] The court agrees with the magistrate's finding of a *Miranda* violation, but finds the magistrate erred in finding that Gastelum was not in custody and that he consented to the search.

**A. Custody**

A *Miranda* warning must precede any custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436 (1966); *United States v. Chamberlain*, 163 F.3d 499, 502 (8th Cir. 1999). *Miranda* focuses on the danger of coercion that results from the interaction of custody and official interrogation. *See Illinois v. Perkins*, 496 U.S. 292, 300 (1990). A custodial interrogation involves "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. Custody occurs either upon formal arrest or under *any other circumstances* where the suspect is deprived of his freedom of action in any significant way. *United States v. Griffin*, 922 F.2d 1343, 1347 (8th Cir. 1990) (emphasis in original). The relevant inquiry in determining custody is whether a reasonable person in the suspect's position would have understood himself to be in custody. *See Chamberlain*, 163 F.3d at 502. In determining whether a suspect is "in custody" at a particular time, the court examines "the extent of the physical or psychological restraints placed on the suspect during interrogation in light of whether a 'reasonable person in the suspect's position would have understood his situation' to be one of custody." *Griffin*, 922

---

[1] Gastelum asserts that the evidence is properly excludable as "fruit of the poisonous tree." This is not necessarily correct. The Eighth Circuit has "refused to extend the fruit-of-the-poisonous-tree doctrine to exclude physical evidence derived from a voluntary statement made in the wake of a Miranda violation." *United States v. Fleck*, 413 F.3d 883, 893 (8th Cir. 2005).

F.2d at 1347 *(quoting Berkemer v. McCarty*, 468 U.S. 420, 429 (1984)). The concern is with a suspect's subjective belief that his freedom of action is curtailed to a degree associated with formal arrest and whether that belief is objectively reasonable under the circumstances. *See Chamberlain*, 163 F.3d at 503.

The custody inquiry involves an examination of the totality of the circumstances. *Griffin*, 922 F.2d at 1347. The determination of whether a reasonable person in defendant's position would have felt free to leave requires close consideration of the circumstances surrounding the interview and of the atmosphere of the interview during questioning. *Chamberlain*, 163 F.2d at 502. The relevant factors to be considered in making a determination of custody include an accused's freedom to leave the scene, and the purpose, place and length of the interrogation. *Griffin*, 922 F.2d at 1347. The court should consider: (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning. *See Chamberlain,* 163 F.3d at 503-04: *cf. United States v. Czichray*, 378 F.3d 822, 826-27 (8th Cir. 2004) (noting that the *Griffin* analysis need not "be followed ritualistically in every *Miranda* case" and "[t]hat a person is told repeatedly that he is free to terminate an interview is powerful evidence that a reasonable person would have understood that he

was free to terminate the interview"). All six of these factors need not be present for a finding of custody requiring a *Miranda* warning, nor is this list exhaustive. *See Chamberlain,* 163 F.3d at 503-04. Courts should also consider the suspect's age, work experience, education and past experience with law enforcement in determining custody. *United States v. LeBrun*, 363 F.3d 715, 724 (8th Cir. 2004)(en banc).

### B. Consent

Under the Fourth and Fourteenth Amendments, searches conducted without a warrant issued upon probable cause are presumptively unreasonable, subject to a few specifically established exceptions, which include a defendant's consent. *United States v. Escobar*, 389 F.3d 781, 784 (8th Cir. 2004). In order to be valid, however, consent must be voluntarily given. *United States v. Fleck*, 314 F.3d 883, 891 (8th Cir. 2005). The burden is on the government to prove, by a preponderance of the evidence, that the consent was voluntary. *Id.* Thus, even assuming the initial contact between defendant and Trooper Riedel, whether characterized as a consensual encounter, a seizure, or an investigative detention, was proper, a subsequent search is permissible only if defendant freely and voluntarily consented.[2] *Escobar,* 389 F.3d at 784.

Whether consent is voluntarily given is a question of fact. *Id.* The test applied to determine if consent is free and voluntary is whether, in light of the totality of the

---

[2]The court expresses no opinion on whether these facts would amount to a reasonable, articulable suspicion so as to justify an investigative detention. The government conceded at the suppression hearing that it relies only on consent to justify the search. The court notes, however, that Trooper Riedel's observations are weak. Specifically, his reliance on Gastelum's alleged hesitation while being questioned about methamphetamine is of no value. The evidence shows that Trooper Riedel questioned Gastelum in harsh terms, and some hesitation would be expected. The court can draw no inference from this evidence. "Conduct that is typical of a broad category of innocent people provides a weak basis for suspicion." *United States v. Tillman,* 81 F. 3d 773, 775 (1996). Moreover, the conflicting reasons Trooper Riedel gave for the stop militate against a finding of probable cause.

circumstances, the consent was given without coercion, express or implied. *Id.* at 784-85. The totality of circumstances include both the characteristics of the accused and the details of the interrogation.[3] *Fleck*, 413 F.3d at 891-92; *United States v. Chaidez*, 906 F.2d 377, 381 (8th Cir. 1990) (identifying eleven factors that inform the decision). The government bears the burden of showing consent was freely and voluntarily given and not a result of duress or coercion. *Escobar*, 389 F.3d at 785. The burden cannot be discharged by showing mere acquiescence to a claim of lawful authority; the government must show that a reasonable person would have believed that the subject of a search gave consent that was the product of an essentially free and unconstrained choice, and that the subject comprehended the choice that he or she was making. *Id.*

The court considers the following factors to determine if consent was freely and voluntarily given: 1) age; 2) general intelligence and education; 3) whether the individual was under the influence of drugs or alcohol; 4) whether he was informed of the *Miranda* rights; and 5) whether he had experienced prior arrests and was, thus, aware of the protections the legal system affords suspected criminals. *Id.* The environment in which the alleged consent was secured is also relevant, including: 1) the length of time the suspect was detained; 2) whether the police threatened, physically intimidated, or punished the suspect; 3) whether the police made promises or misrepresentations; 4) whether the

---

[3] In the related context of determining whether a defendant's second confession can be voluntary if it follows a coerced first confession, courts look at circumstances that show a break in the causal link between the initial and subsequent confessions—including passage of time, change in venue, change in interrogators and use of *Miranda*. *See Oregon v. Elstad,* 470 U.S. 298, 309-10 (1985). Similarly, a break in custody or lapse of time will vitiate the coercive effect of an impermissible violation of the rule that requires interrogation to cease after a suspect has asked for an attorney. *See Holman v. Kemna*, 212 F.3d 413, 419 (8th Cir. 2000). There is nothing in this case that could be said to break the causal connection between the *Miranda* violation and the alleged consent.

10

suspect was in custody or under arrest when the consent was given; 5) whether the consent occurred in a public or a secluded place; and 6) whether the suspect stood by silently as the search occurred.  *Id.*  The court can also consider whether the defendant's contemporaneous reaction to the search was consistent with consent.  *Id.*  These factors should not be applied mechanically, and no single factor is dispositive or controlling.  *Id.*

Although *a Miranda* warning is not required for consent to a search to be voluntary, a proper warning will lessen the probability that a defendant was subtly coerced.  *United States v. Lee,* 356 F.3d 831, 834 (8th Cir. 2003).  Also, although a seizure does not automatically occur if an officer does not inform a detainee that he or she is free to leave, the absence of such notice may imply that the detainee is being restrained.  *Escobar,* 389 F.3d at 786.  "Simply telling a police officer to 'go ahead' with a search is not, in and of itself, proof of voluntary consent."  *Id.*  Also, the consenting party's custodial status alone is not determinative of the voluntariness issue.  *United States v. Czeck*, 105 F.3d 1235, 1239 (8th Cir. 1997).  Police may not convey a message that compliance with a request to search is required.  *Escobar*, 389 F.3d at 781.

### C. Analysis

Under these standards, the court first finds that the magistrate's finding that the defendant did not remain in custody through the duration of the traffic stop is in error.  The magistrate concluded that a reasonable person in defendant's position would have felt he was free to leave.  The court's review of the evidence, however, shows that the defendant had admitted to the law enforcement officer that he was in this country illegally.  Trooper Riedel conceded that he had the authority to detain the defendant for immigration officials.

The defendant had been previously deported, and could reasonably assume that he would be deported again. Although his documents were returned to him, he was subsequently told to return to the car. The defendant had only a rudimentary understanding of the English language. The record shows a significant level of misunderstanding between the trooper and the defendant during the course of the conversation. Trooper Riedel used a loud, if not harsh, tone when directing the defendant to return to the cruiser. Trooper Riedel was in complete uniform and had a dog in his car. He was later joined by a second officer in complete uniform. It is uncontroverted that law enforcement officers did not tell defendant that he was free to leave. Moreover, the evidence shows that law enforcement officers were aware that the defendant did not speak English and, in fact, provided him with an interpreter for all conversations subsequent to the search.

The court similarly finds that the government has not met its burden of showing that the defendant freely and voluntarily consented to the search. The circumstances of this case present a coercive situation. It is undisputed that Trooper Riedel is not conversant in Spanish. The videotape shows that defendant looked and sounded confused during the exchange. Trooper Riedel concedes that he never told defendant he was free to leave. Importantly, the record shows that defendant's first response to the request to search the car was "no." He consented only after he was asked several times, in an increasingly insistent tone, for his consent. No verbal *Miranda* warning was given to the defendant. Although signing a consent to search form is ordinarily strong evidence that consent was voluntary, there has been no showing that the defendant understood the form or understood that he had the right to refuse to give consent. Defendant was shown the consent form in Spanish and asked to read it out loud. The fact that defendant did not do

so indicates that he did not understand the request. Trooper Riedel's repeated requests to read the document were more in the nature of commands. The defendant was given only seven seconds in which to read the document and was then essentially commanded to sign it. Defendant is a Mexican national and there is no evidence regarding his education or intelligence or familiarity with the rights he might have in this country.

Under these circumstances, the court cannot conclude that the consent was the product of a free and unconstrained decision or that the defendant comprehended the decision he made. The combination of the custodial situation, defendant's admission of his immigration status, the presence of the dog and the other officer, defendant's limited understanding of English, and the law enforcement officer's repeated and insistent questions and commands create a coercive environment. The evidence demonstrates that defendant merely acquiesced to the search believing he had no other choice. The court finds the government has not met its burden of showing that defendant's consent to search was voluntary and free of coercion.

THEREFORE, IT IS HEREBY ORDERED that:

1. The report and recommendation of the magistrate, Filing No. 28, is adopted in part and rejected in part; and

2. The defendant's motion to suppress, Filing No. 20, is granted.

DATED this 23rd day of January, 2006.

BY THE COURT:

s/ Joseph F. Bataillon
JOSEPH F. BATAILLON
United States District Judge